NOT FOR PUBLICATION                    [Dkt. Ents. 23, 24, 29]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

## CAMDEN VICINAGE

| | |
|---|---|
| Engines, Inc., | : |
| | : |
| Plaintiff, | : Civil Action No. |
| | : 10-277 (RMB/KMW) |
| v. | : |
| | : **OPINION** |
| MAN Engines & Components, Inc., | : |
| | : |
| Defendant. | : |
| | : |

Appearances:

Mark Oberstaedt
Archer & Greiner, PC
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033-0968

        Attorney for Plaintiff

Carmen Marie Finegan
Halpern & Levy
1204 Township Line Road
Drexel Hill, PA 19026

        Attorney for Defendant.

**BUMB**, UNITED STATES DISTRICT JUDGE:

        This matter comes before the Court upon a motion for

preliminary injunction, pursuant to Federal Rule of Civil

Procedure 65(a), by plaintiff Engines, Inc. ("Engines").  A

business that sells and repairs marine diesel engines, Engines is an authorized dealer for defendant MAN Engines & Components, Inc. ("MAN"). By this action, Engines seeks to enjoin MAN from terminating the Dealer Agreement governing their relationship. Engines and MAN agree that the resolution of this motion turns upon whether their relationship constitutes a "franchise" under the New Jersey Franchise Practices Act ("NJFPA" or "the Act"), N.J. Stat. Ann. § 56:10-1 et seq. Because the Court finds that Engines will likely succeed in establishing that it is a MAN franchise, the motion for preliminary injunction will be granted.

## LEGAL STANDARD

In determining whether to issue a preliminary injunction, courts consider the following four factors: (1) the likelihood of success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest. Abbott Labs. v. Andrx Pharms., Inc., 473 F.3d 1196, 1200-01 (Fed. Cir. 2007) (citations omitted). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988). On an application for a preliminary injunction, a plaintiff need only "make a showing of reasonable probability, not the certainty, of success

on the merits." <u>Atlantic City Coin & Slot Serv. Co., Inc. v.</u> <u>IGT</u>, 14 F. Supp. 2d 644, 657 (D.N.J. 1998) (quoting <u>SK & F Co. v.</u> <u>Premo Pharm. Lab., Inc.</u>, 625 F.2d 1055, 1066 (3d Cir. 1980)).

## FINDINGS OF FACT[1]

1. Engines has been engaged in the business of sales, service, and repair of marine diesel engines, as well as marine and industrial generators, in Atlantic County, New Jersey, since 1985.  (Pecan Aff. ¶ 2.)

2. MAN is in the business of importing and selling MAN diesel engines for a variety of applications such as construction and agricultural machinery, rail vehicles, and marine engines.  (Bruening Aff. ¶ 2.)

3. In October 1999, after concluding a period of negotiation and vetting, MAN and Engines, along with Performance Diesel Inc. (which is not a party to this litigation), executed a

---

[1] All findings of fact are undisputed unless otherwise specified.  The Court is aware that it may not "issue a preliminary injunction that depends upon the resolution of disputed issues of fact unless [it] first holds an evidentiary hearing." <u>Elliott v. Kiesewetter</u>, 98 F.3d 47, 53 (3d Cir. 1996) (citing <u>Professional Plan Examiners of New Jersey, Inc. v.</u> <u>Lefante</u>, 750 F.2d 282, 288 (3d Cir. 1984)).  The Court declined to hold an evidentiary hearing here because it resolves the motion without relying upon disputed facts.
    In some instances, the parties have disputed how the Dealer Agreement should be interpreted.  Of course, "[c]ontract interpretation is usually a question of law in New Jersey." <u>SmithKline Beecham Corp. v. Rohm and Haas Co.</u>, 89 F.3d 154, 159 (3d Cir. 1996) (citing <u>Dome Petroleum Ltd. v. Employers Mut.</u> <u>Liab. Ins. Co.</u>, 767 F.2d 43, 47 (3d Cir. 1985)).

Dealer Agreement, which, in relevant part, provides that Engines shall be "a non-exclusive provider of [after-sale repair, conditioning or replacement] Services" and "a non-exclusive seller of Repowering Products"[2] to the owners of boats with MAN parts, (Dealer Agmt. ¶¶ 1-2). Engines is authorized to perform repairs on MAN engines, which repairs MAN pays Engines to perform when an engine is still under warranty. (<u>Id.</u> at ¶¶ 8-9.) Engines's performance of MAN warranty work -- as well as its promotion of itself as a MAN dealer -- attracts new customers to Engines, which customers then often purchase additional (non-warrantied) parts and services from Engines. (Pecan Aff. ¶ 113-14.)

4.  Although the Dealer Agreement is trilateral, its term ends in full (that is, for all parties) if "terminated as herein provided." (Dealer Agmt. ¶ 27.) Since MAN seeks to terminate the Agreement pursuant to the "Without Cause" provision of ¶ 28, (Termination Ltr. [Def.'s Ex. B]), such termination would end the entire Agreement, including portions affecting Engines's relationship with Performance Diesel Inc.

5.  <u>Tools and Equipment</u>:

---

[2] "Repowering Products" are "Products sold by [Engines] to a Boat Owner to replace an existing Product or Competitive Product." (Dealer Agmt. ¶ 1.10.)

a.  The Dealer Agreement, in relevant part, provides:

    i.  that Engines shall "shall acquire and maintain in satisfactory condition all tools, test equipment, and instruments necessary and appropriate to carry out its Service activities and to install Repowering Products sold by it," (Dealer Agmt. ¶ 19.4); and

    ii.  that Engines shall "purchase from [MAN] the items set forth on Exhibit I annexed hereto and made a part hereof (the "Required Special Tool List"), as the same may be hereafter amended from time-to-time," (<u>Id.</u>)

b.  Engines has purchased approximately $15,000 to $20,000 in specialty tools, either from MAN directly or from Performance Diesel, Inc., which cannot be used on engines made by other manufacturers.[3]

c.  Five years after becoming an authorized dealer, at

---

[3] MAN does not dispute this proposition.  Rather, MAN maintains that when the Dealer Agreement was executed, Engines represented to MAN that it already owned the relevant specialty tools, and, further, that the Dealer Agreement requires MAN to repurchase any specialty tools from Engines upon its termination. (Def.'s Opp'n Br. 7.)  Notably, the Dealer Agreement provides for repurchase of the specialty tools at a discounted rate.  (Dealer Agmt. ¶ 30.1(e) ("[T]he repurchase price therefor shall be the original purchase price paid by [Engines], less the value of the use of such materials . . . .")).

MAN's request, Engines purchased from MAN a computer system, which included mandatory diagnostic cables and a software package, for approximately $10,000.[4]  (Pecan Supp. Aff. ¶¶ 23-28.)  Engines pays MAN a monthly subscription fee, totaling approximately $1,475 annually, for use of the software.  (Def.'s Opp'n Br. 7 n.5.)

6.   <u>Employee Training</u>:

a.   The Dealer Agreement, in relevant part, provides:

   i.   that "at least one of [Engines's] employees [shall] attend a basic training course conducted by [MAN] for a period of no less than one week in order to certify such individual as [a MAN] Service Technician, which training course will be offered by [MAN] at no charge to [Engines]; provided, however, that [Engines] shall be responsible for the costs of transportation, lodging, meals, and other ancillary expenses incurred by its representative in connection with his or her attendance at such training course," (Dealer Agmt. ¶ 20); and

---

[4] Upon termination of the Dealer Agreement, Engines may be able to recoup some of this cost.  <u>See</u> <u>supra</u> note 3.  It is not clear, however, whether the computer equipment would be subject to ¶ 30.1(e) of the Dealer Agreement.

6

      ii.  that "further training that may become necessary during the term of this Agreement will be subject to separate arrangements." (<u>Id.</u>)

b.  All six of Engines's technicians have taken at least three week-long basic training courses at MAN, for which Engines spent approximately $20,000 in travel and other incidental expenses. (Larry Pecan Ver. ¶¶ 14-16.)[5]

7. <u>Insurance</u>:

a.  The Dealer Agreement, in relevant part, provides that Engines shall "obtain, at its sole expense and maintain in force, statutory workers' compensation insurance, casualty insurance, and comprehensive liability insurance coverage . . . throughout the term of this Agreement, which insurance coverage shall name [MAN] and [Performance Diesel Inc.] as additional insureds

---

[5] MAN does not dispute this figure.  Rather, MAN merely characterizes Engines's training-related expenses as "insignificant ancillary expenses."  (Def.'s Opp'n Br. 7-8.)  MAN also implies that Engines's $20,000 training expenditure was unnecessary because "all that MAN requires is that one of Engines's technicians attend a one-week training session." (<u>Id.</u> at 21 n.11.)  Taking as true this proposition, it is not disputed that Engines spent approximately $20,000 to send all six of its technicians to at least three MAN training sessions.

As discussed <u>infra</u>, although MAN contends that Engines did not have to attend all the training sessions that it did, the undisputed facts are that these sessions were provided by MAN, and the Dealer Agreement contemplated such training.

thereunder," (Dealer Agmt. ¶¶ 5-6).

b.    Each year that Engines has been an authorized MAN
      dealer, it has purchased the mandated insurance and, as
      required, named MAN as an additional insured.  (Pecan
      Aff. ¶ 25.)  The precise amount that Engines has spent
      on this is unknown.

8. <u>Promotional Materials / Use of the MAN Mark</u>:

    a.    The Dealer Agreement, in relevant part, provides:

         i.    that Engines's "letterhead and invoice forms and
               other such similar documents shall, in addition to
               identifying [Engines] as an independent
               organization under its registered business name,
               identify [Engines] as an authorized Service Dealer
               for [MAN]," (Dealer Agmt. ¶ 22); and

         ii.   that Engines "shall not, without the express prior
               written consent of [MAN], use any [MAN] Trademark
               in signs, advertising, or elsewhere, except and to
               the extent permitted by this Agreement or
               otherwise by [MAN], and shall, in all events,
               conform to [MAN's] standards and specifications in
               that regard," (<u>Id.</u>); and

         iii.  that "[u]pon termination of this Agreement,
               [Engines] shall immediately cease any and all use

8

of all [MAN] Trademarks," (<u>Id.</u>); and

iv.   that Engines shall "display, at suitable locations at its facilities, advertising and publicity aides designating such facilities as an authorized sales dealership and service workshop for [MAN] Products," (<u>Id.</u> at ¶ 19.3); and

v.    that Engines shall "undertake appropriate promotion activities and public relations work to effectively promote its Service activities and the sale of Repowering Products, in all cases subject to the prior approval of [MAN] . . . ," (<u>Id.</u> at ¶ 18); and

vi.   that "all expenses incurred by [Engines] in connection with its activities hereunder (including those relating to . . . communication expenses and the cost of advertising and public relations work) shall be borne solely by [Engines]," (<u>Id.</u> at ¶ 5.1.)

b.   Engines prominently displays its affiliation with MAN in all of its materials: in the promotional literature it distributes at boat shows and fishing tournaments; in directories, trade journals, print and online advertising; on its signs, apparel, truck fleet,

letterhead, and business cards. (Pecan Aff. ¶ 31-77.) For example, Engines is the only New Jersey dealer to have a full advertisement on the MPC Boater's Directory website, which advertisement prominently features the MAN name and logo and states that Engines provides "authorized service" for MAN. (Id. at 39.) Nearly all of these materials are paid for entirely by Engines.[6]

c.   Customers that come to Engines's business location immediately see that Engines is associated with MAN. (Id. ¶ 68.) Customers encounter MAN's logo on the Engines's truck fleet parked outside its building. (Id.) Engines puts MAN posters, floormats, and other MAN materials, as well as plaques and certificates from MAN training programs and dealer awards, in prominent places in its facility. (Id. at ¶¶ 69-71.) When they are not otherwise being used at the trade shows, Engines displays its large banners, which feature the MAN name and logo, inside its building. (Id. at ¶ 72.) Engines employees sometimes wear Engines/MAN shirts

---

[6] Briefing by Engines provides exhaustive detail about its investments in promoting its relationship with MAN. MAN does not dispute any of these facts. MAN responds only that Engines's promotional efforts were not required by the Dealer Agreement. (Def.'s Opp'n Br. 5-6.) The Court's legal conclusions, therefore, will rely only upon the fact of the extensive promotional efforts, not whether such efforts were contractually mandated.

that Engines designed and purchased.  (<u>Id.</u> at ¶ 74.)

    d.   Engines's extensive promotional efforts have helped build a market for MAN engines and parts.  (<u>Id.</u> ¶ 29.)

9.  <u>Purchase of MAN Products</u>:

    a.   The Dealer Agreement, in relevant part, provides:

       i.   Engines shall "maintain appropriate storage capacity and financial resources to establish a reasonable stock of Products (including both those used in connection with the performance of Services and the sale of Repowering Products) commensurate with expected sales and service Activity requirements and to account for potential fluctuations in availability and delivery," (Dealer Agmt. ¶ 19.1);

      ii.   Engines must purchase all MAN parts from Performance Diesel, Inc. (which Engines characterizes as "MAN's selected distributor"), and cannot "shop around" for better prices. (Pl.'s Br. 17-18 (citing Dealer Agmt. ¶¶ 11.1-3.))

    b.   Engines purchases over $100,000 in MAN parts annually, and maintains a significant stock of MAN parts to date. (Pecan Aff. ¶ 82; Pl.'s Repl. Br. 13.)

10.  <u>Engines's Facilities</u>:

a. The Dealer Agreement, in relevant part, provides:

    i. that Engines shall "maintain the condition of its sales and service facilities in a manner and at a level no less efficient and attractive as the same exists as of the Effective Date," (Dealer Agmt. ¶ 19.2); and

    ii. that Engines will "allow [MAN] . . . representatives free access to its building facilities, during normal business hours and upon reasonable notice, for the purpose of ascertaining [Engines's] compliance with its obligations under this agreement," (Id. at ¶ 19.5).

b. MAN representatives have visited Engines's facilities numerous times (albeit not announced as an "inspection") and have never raised any concerns about the facilities' condition.  (Pl.'s Repl. Br. 9 (citing Pecan Dep. at 117:13-118:1; 184:12-30).)

c. In 2006, Engines moved from Atlantic City to its present location in Pleasantville to accommodate its growing MAN-related business.  (Pecan Aff. ¶¶ 97-101.) Had it not been for the work stemming from its relationship with MAN, Engines would not have needed the large facility it now occupies and it will not be

12

able to use the enlarged space if the relationship is terminated.  (<u>Id.</u>)

11.  Engines's relationship with MAN requires it to accept cuts or give discounts to customers.  (Pl.'s Br. 33.)  For example, when Engines performs MAN's warranty work, it is reimbursed by MAN at a rate discounted from its standard retail pricing.  (<u>Id.</u>)

12.  Nearly every existing and prospective customer who comes into contact with Engines is aware of Engines's relationship with MAN.  (Pl.'s Br. 9.)

13.  A substantial portion (roughly one-half) of Engines's business is attributable to its relationship with MAN. (Pl.'s Br. 23-24, 34.)

   a.  Engines's gross sales in 2007, 2008, and 2009 were $1,232,194.79, $1,383,302.60, and $1,097,324.67, respectively.  Of such sales, the MAN-related portion was $586,286.97 (or 47.6 percent), $683,792.92 (or 49.4 percent), and $390,860.27 (or 35.6 percent),[7] respectively.  (Pecan Aff. ¶¶ 88-96.)[8]

---

[7] Engines attributes 2009's somewhat lower percentage to withdrawn business resulting from the tensions that gave rise to this litigation.

[8] MAN does not dispute the accuracy of these figures.  <u>See infra</u> note 15 and accompanying discussion.

b.  Customers in need of MAN parts or service often reach
Engines though MAN's website and directory of
authorized dealers.  (Pl.'s Br. 23-24.)  Also, Engines
receives profitable business by performing MAN warranty
work, both from reimbursement by MAN and from the
resulting relationships it develops with MAN customers.
(<u>Id.</u>)

14.  Engines has maintained that it is so dependent upon its
relationship with MAN that it "will likely have to shut down
its business operations" if the Dealer Agreement is
terminated.  (Pecan Aff. ¶ 113.)  Although MAN has not
specifically disputed this, MAN has sought to minimize the
effect of its termination of the Dealer Agreement by arguing
that Engines may still continue to service MAN's, and other
manufacturer's, engines even if it is not an authorized MAN
dealer.  Because it is not clear whether MAN genuinely
disputes Engines's position, the Court will make no finding
as to this matter.

**CONCLUSIONS OF LAW**

1.  Engines has established that it will suffer irreparable harm
if the injunction is not granted, and that the balance of
hardships between the parties, as well as the public
interest, weighs in its favor.  Because MAN does not dispute

14

these factors, the Court may summarily find them satisfied. The only preliminary injunction factor that MAN disputes is Engines's likelihood of success on the merits.  "On an application for a preliminary injunction in the early stages of a case, the plaintiff need only 'make a showing of reasonable probability, not the certainty, of success on the merits.'"  Beilowitz v. General Motors Corp., 233 F. Supp. 2d 631, 639 (D.N.J. 2002) (citing Atlantic City Coin & Slot Serv. Co., Inc. v. IGT, 14 F. Supp. 2d 644, 657 (D.N.J. 1998)).

2.    To establish that it is likely to succeed on the merits, Engines must show a likelihood that: (a) its relationship with MAN constitutes a "franchise" under the NJFPA; and (b) it satisfies the "place of business" and "gross sales" requirements of the Act.

3.    Engines must first show a likelihood that its relationship with MAN constitutes a "franchise" under the NJFPA.  To make such a showing, Engines must establish a likelihood that three elements are satisfied:

a.    "[A] written arrangement for a definite or indefinite period,"

b.    "in which a person grants to another person a license to use a trade name, trade mark, service mark, or

related characteristics,"

c.    "and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise."

N.J. Stat. Ann. § 56:10-3.  Because the first two of these elements are not disputed, (Def.'s Opp'n Br. 12-13), the Court finds, without discussion, that they are satisfied. Accordingly, the Court turns to whether Engines shares a "community of interest" with MAN, as defined by the Act.

4.    A "community of interest" exists

> when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skill that will be of minimal utility outside the franchise.

Instructional Systems, Inc. v. Computer Curriculum Corp., 130 N.J. 324, 359, 614 A.2d 124 (1992) (quoting Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp., 944 F.2d 1131, 1143 (3d Cir. 1991)).  The Act requires that franchisor and franchisee share a community of interest because, "once a business has made substantial franchise-specific investments it loses all or virtually all of its original bargaining power regarding the continuation of the franchise."  Id. at 357.  Importantly, "[c]ommunity of interest means more than

16

the mere fact that two parties share in profits or that the distributor rely on a single supplier."  W. Michael Garner, 1 Franch. & Distr. Law & Prac. § 5:29 (WL 2010) (citing Southern States Co-op., Inc. v. Global AG Associates, Inc., No. 06-1494, 2008 WL 834389, *4 (E.D. Pa. Mar. 27, 2008)). Rather, in addition to such business entwinement, a franchise is characterized by certain "indicia of control" of franchisor over franchisee.  New Jersey American, Inc. v. Allied Corp., 875 F.2d 58, 62 (3d Cir. 1989) (citing Colt Industries Inc. v. Fidelco Pump & Compressor Corp., 844 F.2d 117 (3d Cir. 1988)).

5.   The Engines-MAN relationship bears the very "indicia of control" that are the hallmark of a franchise "community of interest."  Describing such "indicia of control," the Third Circuit has said,

> In addition to the value of such tangible investments as a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs, a franchisee may lose such intangibles as business good will if it is forced to move from its business premises or change its name and product line upon termination by the franchisor.

New Jersey American, 875 F.2d at 62.  Engines stands to lose all of the above-mentioned tangible and intangible

17

equities:[9]

a.    To accommodate its MAN-related business, Engines moved
      to a larger building, which it will not be able to
      fully use if its relationship with MAN ends;

b.    Engines purchased specialty tools and a computer system
      in service of its MAN-related business; while it may
      recoup some of the cost of these items, some (perhaps
      most) of the cost will not be recoverable;
      additionally, its intangible investment in mastering
      the use of such specialty equipment is not recoverable;

c.    Engines's affiliation with MAN is prominently displayed
      on its signs, truck fleet, promotional literature,
      advertisements, letterhead, business-cards, apparel,
      etc.; its investment in paying to produce these items,
      as well as its investment in developing a customer base
      that associates Engines with MAN products and services,
      will be a sunk cost if the relationship terminates;

---

[9] It is notable how similar Engines's potential loss of
equities is to the lost equities mentioned in Instructional
Systems.  There, the Court "noted that the franchisee . . . had
purchased, in terms of tangible capital assets, the following:
office facilities; specialized computers to demonstrate software
and programs; promotional products; signs bearing the
manufacturer's name; and computer upgrades.  The . . . franchisee
had also maintained inventories."  Atlantic City Coin & Slot
Serv. Co., Inc. v. IGT, 14 F. Supp. 2d 644, 662 (D.N.J. 1998)
(citing Instructional Systems, 130 N.J. at 357, 363).

d.    Engines has invested in sending its employees to numerous week-long MAN training sessions, paying employee salaries, as well as approximately $20,000 in travel and incidental expenses, for such training;

e.    Engines maintains a substantial inventory of MAN parts, which, it is not disputed, Engines will have significantly less opportunity to sell if the relationship terminates.[10]

6.    While the MAN-Engines relationship accords to MAN substantial leverage over Engines, Engines by comparison retains little leverage over MAN.  The cases defining a franchise "community of interest" focus on the importance of "unequal bargaining power" between franchisor and franchisee.  See, e.g., New Jersey American, 875 F.2d at 63-64.  Here, a substantial portion of Engines's business comes from the warranty work it performs for MAN, the consumer relationships that emerge from this warranty work, and consumers who find Engines through listings of MAN dealers.

_____

[10] Engines has said that it cannot estimate the value of its stock of MAN parts, but, as one indicator of the substantial size of this stock, Engines has proffered (and MAN does not dispute) that it purchases more than $100,000 in MAN parts annually.  MAN contends that Engines will be free to sell such inventory after the Dealer Agreement terminates. (Def.'s Opp'n Br. 19 n.9.)  MAN does not dispute, however, that the loss of MAN warranty work will, in turn, cause a loss of customers to purchase MAN parts from Engines.  Thus, Engines will likely be left with fewer customers to purchase its large stock of inventory.

In sum, Engines relies heavily upon MAN.  MAN, by contrast, can easily send its warranty work elsewhere, and Engines's sales of MAN parts does not yield a substantial portion of MAN's overall profits.  The inequality of this relationship is indicative of a franchise.[11]

7.  Much of MAN's argumentation relies upon the premise that Engines's investments in the putative franchise were not required by the Dealer Agreement.  For example, MAN contends that Engines's extensive promotion of its relationship with MAN, as well as the expenses incurred by Engines in sending its employees to MAN training seminars, were undertaken voluntarily.  (Def.'s Opp'n Br. 7, 6 n.4.)  This argument evinces a misunderstanding of the NJFPA.  The Court's inquiry is not limited to the four-corners of the Dealer Agreement, nor should it be.  The New Jersey Supreme Court has instructed that the putative franchise should be evaluated according to "the terms of the agreement between the parties <u>or the nature of the franchise business</u> . . . ."

---

[11] The inequality is embodied in the Dealer Agreement itself.  To wit, the Agreement imposes a great many obligations upon Engines, while it imposes relatively few upon MAN.  Notably, it affords only MAN the right to terminate for cause.  (Dealer Agmt. ¶ 29.)  This is presumably attributable to the paucity of obligations for which MAN is responsible.  In other words, since the obligations created by the Agreement run mainly one-way, the right to terminate for failure to perform those obligations logically runs only in the opposite direction.

Instructional Systems, 130 N.J. at 359 (emphasis added).[12]

Business relationships evolve, and are not necessarily fully
captured by their foundational contract.  Here, at the very
least, MAN acceded to, if not required, Engines's franchise-
related expenses.  (Indeed, it is peculiar for MAN to now
characterize the participation of Engines employees in MAN
training seminars as Engines's unilateral undertaking, since
these seminars, it is not disputed, were sponsored, hosted,
funded, and executed by MAN.)

8.   MAN's argument that Engines's franchise-related investments

---

[12] In Atlantic City Coin & Slot Service Co., Inc. v. IGT,
Judge Brotman provided an excellent analysis of this very issue.
14 F. Supp. 2d 644, 659-61 (D.N.J. 1998).  Atlantic City explains
that earlier cases, particularly Colt and Neptune, focused on the
"control" of franchisor over franchisee.  Under this early
doctrine, it may indeed have been dispositive that a franchisee's
investments were not specifically mandated (as MAN now argues).
See Colt, 844 F.2d at 120-21.  Later cases effectively abrogated
this early formulation, however, instead following the path
suggested by Judge Rosenn's Colt dissent.  The New Jersey Supreme
Court's 1992 Instructional Systems decision "is noteworthy not
only for what it says but also for what it does not say.  Nowhere
in the court's community of interest inquiry does it specifically
adopt anything resembling the 'control' test superimposed on the
Act by earlier federal decisions."  Atlantic City, 14 F. Supp. 2d
at 661.  In turn, the later Third Circuit case Cooper
Distributing Co., Inc. v. Amana Refrigeration, 63 F.3d 262 (3d
Cir. 1995), followed the New Jersey Supreme Court's "quiet
avoidance of the 'control' test . . . ."  Atlantic City, 14 F.
Supp. 2d at 661.  Rather than focus on control of franchisor over
franchisee, courts assess a "community of interest" by the
"symbiotic character of a true franchise arrangement and the
consequent vulnerability of the alleged franchisee to an
unconscionable loss of his tangible and intangible equities."
Instructional Systems, 130 N.J. at 359 (citing Neptune, 190 N.J.
Super. at 165).

were not required by the Dealer Agreement is invalid for yet a second reason.  Whether or not the Dealer Agreement "required" Engines's investments, the Agreement clearly "contemplates such future investment."  <u>New Jersey American</u>, 875 F.2d at 65.  For example, the Agreement sets extensive terms for use of the MAN mark in Engines's literature and promotional materials.  (<u>See, e.g.</u>, Dealer Agmt. ¶¶ 5.1, 18, 19.3, 22.)  Thus, it cannot seriously be argued that such use, while possibly voluntary, is not within the scope of the relationship contemplated by the Agreement.  Similarly, while the Dealer Agreement narrowly requires the training of only one Engines employee, it also provides, "further training . . . may become necessary during the term of the agreement." (Dealer Agmt. ¶ 20.)  Thus, it cannot seriously be disputed that such "further training", even if not specifically required by MAN, was contemplated by the Agreement.

9.  The fact that Engines also sells products and services for MAN-competitors does not defeat the relationship's character as a franchise.  The Third Circuit has said, "Although [courts should] consider this factor, [they] cannot place too much weight on it, since N.J. Stat. Ann. § 56:10-4, by excluding from the Act's reach a franchisee that derives 20% or less of gross sales from its franchisor, implies that a

firm may be a franchisee even if only 21% of its gross sales
are derived from the franchisor." <u>New Jersey American</u>, 875
F.2d at 63.

10. Engines and MAN share a "symbiotic" relationship, which is
characteristic of a community of interest.  <u>Instructional
Systems</u>, 130 N.J. at 359-362 (citing <u>Neptune</u>, 190 N.J.
Super. at 164; <u>Ziegler Co. v. Rexnord, Inc.</u>, 407 N.W.2d 873
(Wis. 1987), <u>reh'g granted on other grounds</u>, 433 N.W.2d 8
(Wis. 1988)).  "[O]ne guidepost to determine the existence
of a community of interest is whether there is a 'continuing
financial interest' between the companies." <u>Id.</u> at 360.
MAN concedes that its dealer relationships are "necessary"
to its profitability.  (Def.'s Opp'n Br. 9.)  This is so
because MAN advertises the repair services of dealers like
Engines, as well as the abundant parts availability provided
by dealers like Engines, to induce customers to purchase MAN
products.  (Pecan Supp. Aff. ¶ 41.)  Further, Engines's
joint promotional initiatives help to build a customer base
for both companies.  Finally, customers for whom Engines
performs satisfactory warranty work are more likely to
become repeat customers for <u>both</u> Engines and MAN.

11. Of course, the interests of Engines and MAN are not
perfectly aligned, and, as is common in a franchise
relationship, their interests are sometimes at odds.  For

example, Engines's performance of particular warranty jobs
is profitable for Engines but costly for MAN.  This fact
alone does not defeat the existence of a community of
interest.  Even when the interests of putative franchisor
and franchisee are not perfectly aligned, a community of
interest exists when the two entities "share[] [a] financial
interest in the operation of the dealership or the marketing
of a good or service."  <u>Instructional Systems</u>, 130 N.J. at
360.  This shared financial interest is evidenced by
"'interdependence' between the parties, which refers to the
'degree to which the dealer and grantor cooperate,
coordinate their activities and share common goals in their
business relationship.'"  <u>Id.</u>  Here, examples of such
interdependence are: that Engines provides a service
(warranty work), which is "necessary" to MAN's
profitability; that Engines promotes its relationship with
MAN through advertising, etc., which builds a consumer base
for both companies; that MAN provides and funds training for
Engines's employees; and that MAN sets standards for
Engines's facilities and services.[13]  Here, it is readily

---

[13] MAN has maintained throughout this litigation that the
reason for its desire to terminate its relationship with Engines
is its dissatisfaction with the quality of Engines's repair work.
(Def.'s Opp'n Br. 15 n.7.)  The implication, of course, is that
bad work by Engines reflects poorly on MAN. (<u>Id.</u>) This certainly
suggests the very sort of "interdependence" and "symbiosis" that
the community of interest requirement contemplates.

apparent that the "business relationship [is] more coordinated and interrelated than a typical vendor-vendee relationship." Ziegler, 407 N.W.2d at 881.

12. The Neptune case, on which MAN heavily relies, does not weigh to the contrary.  Neptune held that a provider of Litton microwave repairs, Neptune T.V. & Appliance Service, Inc., was not a Litton franchise because,

> Litton's sole interest in the repair business was that Neptune perform the repairs in a satisfactory manner.  Litton had no interest in the volume of plaintiff's business, and its own interests were best served if its products required as few warranty repairs as possible.  Litton did not profit from nor had it performed its business through the repair operations, and Neptune did not contribute toward building Litton's business. Furthermore . . . , Neptune . . . was not particularly susceptible to abuse as a result of any inequitable-financial leverage between the parties.

Instructional Systems, 130 N.J. at 359 (citing Neptune, 190 N.J. Super at 165-67).  Although the core of the Engines-MAN relationship is similarly warranty repairs, the parallels to Neptune end there.  First, microwaves are not analogous to marine engines, which often exceed $100,000 in cost and normally require occasional repair.  For this reason, customers are likely to consider warranty repairs in purchasing marine engines, but not microwaves.  Second, unlike in Neptune, MAN's interest in Engines's business does

25

not stop at the quality of Engines's repairs.  As previously discussed, Engines helps to build a customer base for MAN by, for example, promoting the MAN brand and its engines at trade shows and in advertising.  Third, unlike in Neptune, MAN has profited from Engines's retail sales of MAN parts. Finally, for all of the previously mentioned reasons, Engines, unlike the putative franchisee of Neptune, is "particularly susceptible to abuse as a result of [the] inequitable-financial leverage between the parties."  Id.[14]

13.  Persuasive to the Court is Third Circuit dicta in New Jersey American, which characterized that case as presenting "an extremely close question of . . . the meaning of [the] requirement that there be a 'community of interest' between franchisor and franchisee . . . ."  875 F.2d at 59. Presumably, if those facts gave rise to "an extremely close" case, then future cases whose facts bear more indicia of a "community of interest" will comfortably satisfy the requirement.  That is precisely the case here.  Facts suggesting that Engines more closely resembles a franchisee than NJA (the precedent cases's putative franchisee) are:

---

[14] Furthermore, the continuing precedential force of Neptune is a subject of doubt.  The law has evolved substantially since Neptune, see supra note 12, and the New Jersey Supreme Court seemed to prefer the analysis of Ziegler in its discussion in the now-leading case, Instructional Systems.  130 N.J. at 359-62.

a.  Here, MAN-related sales constitute Engines's greatest portion of sales; in New Jersey American, Bendix sales were outnumbered by sales of a competitor-product, Fasa. 875 F.2d at 59.

b.  Here, Engines is required to use MAN's trademark. (See, e.g., Dealer Agmt. ¶ 22 ("All publicity material, printed matter, and other publication referring to [Engines's] relationship with [MAN] shall bear the [MAN] name and the [MAN] Trademarks . . . ."). No such requirement was present in New Jersey American. 875 F.2d at 59.

c.  Here, pricing for warranty work is controlled by MAN; in New Jersey American, NJA had "complete freedom to set prices . . . ." Id.

d.  In New Jersey American, the putative franchise relationship "did not mandate that NJA invest in Bendix-specific capital equipment or good will." Id. at 60. Here, by contrast, it does. In fact, contractual requirements aside, NJA presented no evidence that it undertook any substantial investments in Allied's business. Id. at 63-64. Here, in sharp contrast, there is ample evidence of such investment: tools and equipment, training, and promotional

27

materials.

e.   In <u>New Jersey American</u>, the putative franchisor, Allied, often reimbursed NJA for advertising that incorporated Allied's name or mark, <u>id.</u>; here, by contrast, Engines alone has borne all joint advertising costs.

f.   The operative contract in <u>New Jersey American</u> "was not a sales contract; rather, it set the terms under which future agreements to sell would be made." <u>Id.</u> at 59. The Dealer Agreement here, by contrast, promises to Engines the right to perform and be reimbursed for any warranty work presented by a MAN customer.   In other words, the Dealer Agreement here guarantees to Engines actual sales of its services.

14.   Accordingly, the Court finds that Engines has established a likelihood that it and MAN share a community of interest, as required by the NJFPA.   Because all the statutory elements of a "franchise" are therefore satisfied, the Court finds a likelihood that Engines is a MAN franchise under the Act.

15.   The above finding does not end the Court's inquiry, however. To qualify for protection under the NJFPA, in addition to showing a likelihood that it is a "franchise", Engines must show that it satisfies the Act's "place of business" and

"gross sales" requirements.  The Act applies only to

> a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise . . . .

N.J. Stat. Ann. § 56:10-4.  It is not disputed that the first and second elements -- location and total sales -- are easily satisfied here.  (Def.'s Opp'n Br. 26.)  MAN does, however, dispute that more than 20 percent of Engines's gross sales are intended to be or are derived from the putative franchise relationship (the third element).  This dispute turns upon questions of law, not fact.

a.  The parties do not dispute the relevant figures: Engines's gross sales in 2007, 2008, and 2009 were $1,232,194.79, $1,383,302.60, and $1,097,324.67, respectively.  Of such sales, the MAN-related portion was $586,286.97 (or 47.6 percent), $683,792.92 (or 49.4 percent), and $390,860.27 (or 35.6 percent), respectively.

b.  MAN disputes that the relevant "gross sales" include all of Engines's MAN-related business; instead, MAN

maintains that the relevant "gross sales" include only MAN warranty work performed by Engines, not other associated retail sales of MAN parts.  As an initial matter, although MAN alluded to its position in the closing sentences of its opposition brief, it fully propounded this argument for the first time in a supplemental letter brief, which the Court largely struck as procedurally defective.[15]  (Ltr. Ord., July 2, 2010 [Dkt. Ent. 33].)  The Court therefore rejects MAN's position on this procedural basis.

c.  Even if the Court were to entertain the argument for purposes of completeness, it would reject it.  The

_____

[15] Apart from a few perfunctory sentences inserted at the close of MAN's opposition brief, MAN opted not to substantively dispute Engines's position regarding the Act's 20 percent threshold.  (See Def.'s Opp'n Br. 26.)  In this Court, such an omission constitutes a waiver.  Tsitsoulis v. Twp. of Denville, No. 07-4544, 2009 WL 5205276, *8 (D.N.J. Dec. 23, 2009) (citing Conroy v. Leone, 316 F. App'x 140, 144 n.5 (3d Cir. 2009); see also United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").  In an abundance of caution, the Court sought clarification from MAN, by way of Letter Order, of whether it disputed the figures offered in the briefs and exhibits submitted by Engines.  [Dkt. Ent. 30.]  Only then, for the first time, did MAN seize the opportunity to develop new legal argumentation and present new evidence in its supplemental letter brief.  [Dkt. Ent. 31.]  Engines objected to the supplemental submission on the grounds that, rather than squarely addressing the Court's request, MAN had presented new facts and arguments without the requisite leave of the Court, giving Engines no opportunity to respond.  [Dkt. Ent. 32.]  Accordingly, the Court largely struck MAN's brief as non-responsive and procedurally defective.  [Dkt. Ent. 33.]

complicating fact unique to this case is that the putative franchise agreement -- the "Dealer Agreement" -- is a trilateral, not bilateral, agreement.  The contract promises to Engines the right to perform MAN warranty work, as well as the right to be an "authorized dealer" of MAN parts, supplied by the contract's third party, Performance Diesel Inc.  MAN's argument rests upon its assumption that the only portion of the contract relevant to Engines's putative franchise status is the warranty work that MAN contractually promised to Engines.  This slices the contract too thin.  The contract is called a "<u>Dealer Agreement</u>" (emphasis added); it promises to Engines not just the warranty work, but also profit from other MAN-related business such as parts sales.  The fact that the contract also promises to an intervening wholesale distributor the exclusive right to sell MAN parts to Engines does not alone excise Engines's sales of MAN parts from the franchise inquiry.[16]

_____

[16] MAN persistently argues that Engines could sell MAN parts absent the Dealer Agreement; thus, MAN's argument goes, parts sales should not be included in a calculation of sales derived from the putative franchise.  This argument strains credulity.  The Dealer Agreement obviously contemplates a benefit to Engines that is a package of new business: warranty work and parts sales, yielding new customers who would, in turn, purchase more MAN parts and services from Engines.

The NJFPA pointedly requires that more than 20 percent of the franchisee's gross sales must be "derived from" or, importantly, "<u>intended to be</u> . . . <u>derived from</u>" the relationship.  N.J. Stat. Ann. § 56:10-4(3) (emphasis added).  In other words, the Court's inquiry is, broadly, whether the putative franchise agreement contemplates a benefit to the franchisee exceeding 20 percent of its sales.  Here, the benefit to Engines contemplated by the Dealer Agreement is clearly more than the modest profit it would derive from just performing MAN warranty work.

16. For all of these reasons, the Court finds a likelihood that Engines enjoys protection as a franchisee under the NJFPA.  Accordingly, Engines has established a likelihood of success on the merits.  Because the other factors relevant to a motion for preliminary injunction are not in dispute, the Court finds that a preliminary injunction is appropriate.

**CONCLUSION**

---

Also, in a footnote, MAN says that <u>Neptune</u> stands for the proposition that only warranty work is relevant to the Act's 20 percent threshold.  In fact, <u>Neptune</u> specifically leaves this question unresolved.  <u>See</u> 190 N.J. Super. at 158 n.1 ("[T]he trial judge concluded . . . that the dispute as to gross sales between the parties and the percentage of plaintiff's business represented thereby <u>did not require resolution</u>.  <u>We concur</u>." (emphasis added)).

32

     In light of the findings of fact and conclusions of law contained herein, the Court will grant Engines's motion for preliminary injunction.  An Order will accompany this Opinion.


Date: _July 29, 2010_                _s/Renée Marie Bumb_____
                                     RENÉE MARIE BUMB
                                     UNITED STATES DISTRICT JUDGE